615 F.2d 158
 Edward Howard WITHERS, Appellant,
v.
Mark LEVINE, Commissioner, Division of Correction; Robert
McColley, Deputy Commissioner, Division of Correction; Ralph
Williams, Warden, Maryland House of Correction; Marcellus
Moore, Assistant Warden for Treatment, Maryland House of
Correction; John Byrne, Assistant Warden for Custody,
Maryland House of Correction; James Jordan, Individually, Appellees.
Edward Howard WITHERS, Appellee,
v.
Mark LEVINE, Commissioner, Division of Correction; Robert
McColley, Deputy Commissioner, Division of Correction; Ralph
Williams, Warden, Maryland House of Correction; Marcellus
Moore, Assistant Warden for Treatment, Maryland House of
Correction; John Byrne, Assistant Warden for Custody,
Maryland House of Correction; James Jordan, Individually, Appellants.
 Nos. 78-6336, 78-6337.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 8, 1979.
Decided Feb. 5, 1980.
 
 Craig E. Smith and Charles M. Kerr, Baltimore, Md., for appellant in 78-6336 and for appellee in 78-6337.
 Donald R. Stutman, Asst. Atty. Gen., Baltimore, Md. (Francis B. Burch, Atty. Gen. of Maryland, Clarence W. Sharp, Asst. Atty. Gen., Chief, Crim. Div., Michael A. Anselmi, Asst. Atty. Gen., Baltimore, Md., on brief), for appellees in 78-6336 and for appellants in 78-6337.
 Before HAYNSWORTH, Chief Judge, and WINTER and MILLER,* Circuit Judges.
 HAYNSWORTH, Chief Judge:
 
 
 1
 In this § 1983[1] action, the district court granted declaratory and injunctive relief, requiring prison officials to devise a procedure to provide inmates with reasonable protection from aggressive sexual assaults. The findings of fact are fully supported in the record, and, since we approve the court's legal reasoning, we affirm. See Withers v. Levine, 449 F.Supp. 473 (D.Md.1978).
 
 
 2
 In the Maryland House of Corrections, a medium security institution for males, some homosexual rapes are reported annually. There was evidence, however, that many more such assaults go unreported because the victim is usually threatened with violence or death should the incident be reported. Typically, the attacks are upon younger prisoners, and a young, white, slightly built man is at the greatest risk of all. Withers, although black, otherwise fits this description. Moreover, it appears that once a prisoner has been thus victimized, word spreads throughout the prison and he becomes a special target for subsequent attacks.
 
 
 3
 Newly arriving prisoners at MHC are placed on an "idle tier" where they remain from sixty to ninety days, pending assignment to a prison job and regular housing. Prisoners were assigned to two-man cells, largely on the basis of space availability and without regard to considerations of safety.
 
 
 4
 When Withers first arrived at MHC he got into an altercation with his cellmate who attempted a sexual assault. As a result of the altercation, each of them was put in solitary confinement, but Withers requested a transfer to another institution. He reported that he had been the victim of a similar assault three years earlier while in the Baltimore City Jail. Because of his age and his victimization by sexually aggressive prisoners, he was transferred to the Maryland Correctional Institute at Hagerstown. Approximately one and one-half years later, however, he was transferred back to MHC despite the fact that the classification team which ordered the transfer had reviewed his base file which contained information about the sexual assaults upon him. No effort was made to alert the cell assignment officials at MHC to any need of special care for Withers.
 
 
 5
 When he arrived at MHC the second time, the cell assignment official placed him in a cell with a prisoner named Redd. The base file goes with the prisoner, but it goes to the records office and was unavailable to the cell assigning official. Had it been available and had that official consulted it, he would have learned of Withers' earlier victimizations. Had he reviewed Redd's file, he would have learned that Redd, a large man, had a history of violent, aggressive, sexual assaults.
 
 
 6
 On his second night in the cell with Redd, threatened by a razor and pressed with Redd's greater weight and strength, Withers again became the victim of a sexual assault.
 
 I.
 
 7
 It is suggested that Withers has now been transferred to the Maryland Penitentiary, a maximum security institution, and is no longer housed on the idle tier at MHC.
 
 
 8
 Dismissal for mootness is suggested.
 
 
 9
 The transfer will not moot the damage claim, though that claim had been decided against Withers in the district court on the ground that the defendants enjoyed a qualified immunity. Because of Withers' appeal, however, the question is an open one here and cannot be said to be moot. Memphis Light, Gas & Water Division v. Craft, 436 U.S. 1, 8-9, 98 S.Ct. 1554, 1559-1560, 56 L.Ed.2d 30 (1978).
 
 
 10
 Even if the damage claim was the only thing that saved the case from Article III mootness, injunctive relief may still be granted if appropriate under discretionary injunction principles. C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure, § 3533 at 273, n.49 (1975). Here the district court could appropriately conclude that an award of monetary damages to Withers would not adequately remedy the great risk of violence to which Withers and prisoners like him were subject on the idle tier at MHC.
 
 
 11
 More importantly, perhaps, this is a case "capable of repetition, yet evading review" which is an exception to the mootness doctrine. Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). Newly received prisoners at MHC are housed on the idle tier no more than sixty to ninety days. That does not provide sufficient time to litigate the adequacy of measures to provide such prisoners as Withers with reasonable protection. Withers had been twice transferred to MHC, and each time became the victim of a sexual assault. He is still in Maryland's prison system, and, since he had been previously considered appropriate for minimum custody housing, he again may be transferred to MHC. Such a retransfer cannot be said to be purely speculative, and, from Withers' point of view, there is a reasonable expectation that he again may be subjected to the same action. Thus the two requirements of Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975) (per curiam) are met. See also First National Bank of Boston v. Bellotti, 435 U.S. 765, 774-75, 98 S.Ct. 1407, 1414-15, 55 L.Ed.2d 707 (1978).
 
 II.
 
 12
 In Woodhous v. Virginia, 487 F.2d 889 (4th Cir. 1973), we held that a prisoner has a constitutional right "to be reasonably protected from the constant threat of violence and sexual assault from his fellow inmates . . . ." To obtain relief, he must show "a pervasive risk of harm to inmates from other prisoners" and that the prison officials have failed to exercise reasonable care to prevent prisoners from intentionally inflicting harm or creating unreasonable risks of harm to other prisoners.
 
 A.
 
 13
 A pervasive risk of harm may not ordinarily be shown by pointing to a single incident or isolated incidents, but it may be established by much less than proof of a reign of violence and terror in the particular institution. The defendants seized upon that explanatory phrase from Woodhous to contend that something approaching anarchy must be proven before a cause of action under Woodhous may be made out, but conditions need not deteriorate to that extent before the constitutional right to protection arises. It is enough that violence and sexual assaults occur on the idle tier at MHC with sufficient frequency that the younger prisoners, particularly those slightly built, are put in reasonable fear for their safety and to reasonably apprise prison officials of the existence of the problem and the need for protective measures. The proof in this case and the findings of the district court fully meet those requirements.
 
 
 14
 It is not necessary to show that all prisoners suffer a pervasive risk of harm. It is enough that an identifiable group of prisoners do, if the complainant is a member of that group. It is irrelevant that larger, older men need experience no such fear, when younger and smaller men are frequently victimized and each such person has a reasonable basis for fearing that he will become a victim or will be victimized again. The analysis in the opinion of the district court, while showing that sexual assault was not rampant at MHC or on its idle tiers, amply demonstrates that the risk of sexual assault was a serious problem of substantial dimensions, particularly for younger prisoners. It surely was enough to require the prison officials to take reasonable precautions to provide reasonable protection for such prisoners.
 
 B.
 
 15
 The defendants have not contended that an action under § 1983 might not be founded upon simple negligence in light of the nature of this claim and the constitutional right upon which it is founded. In light of the recurrent broad contentions to that effect, however, the matter deserves a word. See Baker v. McCollan, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). The question deserves an answer as a part of the Woodhous test.
 
 
 16
 As the Supreme Court stated in Baker, the question is not susceptible to a broad answer. Before one becomes concerned with the nature and the quality of the wrong, one must first look for the constitutional right, protection of which is sought, and the kind of protection which is required. Surely the Constitution of the United States does not lend its protection to every victim of a common law tort by state officials and employees. Negligence in the treatment of a state prisoner's illness or injury may give rise to a state cause of action, but it is not a violation of the Constitution's proscription of cruel and unusual punishment, but deliberate neglect of a prisoner's important need for medical treatment is such a violation. Estelle v. Gamble, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). But negligence by a state official under some circumstances may itself violate a constitutionally protected right; when it does, it is actionable under § 1983. McCray v. Maryland, 456 F.2d 1, 5 (4th Cir. 1972).
 
 
 17
 When there is present in a prison or in an identifiable portion of it, a pervasive risk of harm to all prisoners, or to an identifiable group of them, the constitutional prohibition against cruel and unusual punishment requires that prison officials exercise reasonable care to provide reasonable protection from such unreasonable risk of harm. Given the pervasive and unreasonable risk of harm, negligence by prison officials in their performance of their duty of care is a violation of the constitutional right and actionable under § 1983. The constitutional right would often remain unredressed if a higher standard of care were required.
 
 
 18
 Moreover, the principal fault found by the district judge was the absence of any procedure for matching cellmates on the idle tier except the matter of the availability of a bed. In assigning a person such as Withers, whose age and physical characteristics put him in the high risk group for victimization by sexual assault, the absence of any procedure or guidelines to assist the assigning official was probably much more than simple negligence. It was the development of such procedures that the district court's injunction properly directed.
 
 
 19
 There was a contention by the defense that the conduct was not even negligent and that there was an established operating procedure by which the classification officials of the transferring institution would alert the officials of the other institution if an inmate had any special problems about housing assignments. The procedure did not function as intended in this instance, but the primary fault was at MHC. Withers may reasonably have been thought by the officials of the transferring institution as not requiring assignment to a single cell, but as being generally appropriate for assignment in the general population. Similarly, classification officials may reasonably have thought that Redd's earlier history was stale and that assignment of him to a single cell was no longer necessary. While each might have been assigned with safety to a cell to which some other prisoner was assigned, the assignment of those two to the same cell created great risk of harm to Withers. This should have been obvious to one who looked at their individual characteristics with any concern for the protection and the safety of Withers. The officials of the transferring institution had no reason to suppose that the cell assignment official at MHC would place that slightly built young male in the same cell with a prisoner such as Redd. Adequate procedures at MHC could have insured that the cell assignment official was better informed so that he could have acted without complete indifference to the problem of safety.
 
 III.
 
 20
 In the plaintiff's appeal, he complains of the denial of damages upon the district court's conclusion that the defendants were entitled to immunity under Procunier v. Navarette, 434 U.S. 555, 98 S.Ct. 855, 55 L.Ed.2d 24 (1978) and Wood v. Strickland, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975). Mistakenly he addresses the problem in terms of a distinction between ministerial and discretionary actions.
 
 
 21
 Under Procunier and Wood, a good faith immunity defense against liability for damages is extended to a state official who acted without knowledge or reason to know that his action would violate a constitutionally protected right. He cannot be expected to predict a course of evolution of constitutional doctrine, and, in a § 1983 action, he is responsible in damages only when he acts in violation of a "clearly established" constitutional right.
 
 
 22
 At the time of this occurrence, our opinion in Woodhous had been announced, but it had not been published. There is no basis for charging these officials with knowledge of it. Moreover, Woodhous only defined the right in broad outline, leaving its precise contours for later definition, and the defendants ought not to be chargeable with foreknowledge of its application here. Finally, the immunity question turns not upon the reasonableness or unreasonableness of the defendants' conduct, but upon whether they had reason to believe they were violating a constitutional right. We think the district court properly concluded that they did not.
 
 IV.
 
 23
 Finally, the defendants claim that they were unduly restricted in their cross-examination of three of the plaintiff's witnesses.
 
 
 24
 At trial, plaintiff called three fellow inmates to testify regarding the prevalence of sexual assault in Maryland prisons. These witnesses expressed fear of reprisal if they were to identify in open court the names of particular victims and assailants. The judge, therefore, allowed the witnesses to reveal the names to him in camera after which he reported those names to defense counsel. In this way no particular identification could be connected with a specific witness, while at the same time defense counsel could pursue any relevant inquiries regarding those persons identified.
 
 
 25
 Under Rule 611 of the Federal Rules of Evidence, a trial court has broad control over witness interrogation and cross-examination. With respect to the immediate contention, Rule 611(a) states:
 
 
 26
 "The court shall exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to . . . protect witnesses from harassment or undue embarrassment."
 
 
 27
 Thus, "(t)he trial judge may impose reasonable limits on the extent of cross-examination," United States v. Atkinson, 512 F.2d 1235, 1238 (4th Cir. 1975), in order to protect a witness. The method followed by the court in this case was not an abuse of discretion. It struck a fair balance between the safety of the witnesses and the need of the defendants to cross-examine.
 
 V.
 
 28
 Agreeing with the district court's findings and conclusions, the judgment is affirmed in all respects.
 
 
 29
 AFFIRMED.
 
 
 
 *
 Honorable Jack R. Miller of the United States Court of Customs and Patent Appeals, sitting by designation
 
 
 [1]
 42 U.S.C.A. § 1983